**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　*Plaintiff*,<br><br>　v.<br><br>ANTHONY ALBENCE, in his official capacity as State Election Commissioner of the State of Delaware,<br><br>　　　　　　　*Defendant*. | C.A. No. 25-cv-01453-RGA |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF LATIN AMERICAN COMMUNITY CENTER, LA ESPERANZA, DELAWARE COALITION AGAINST DOMESTIC VIOLENCE, AND JOSE MATTHEWS**

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

    I.   DOJ's Efforts to Obtain Private Voter Information....................................... 1

    II.  The United States' Plans to Unlawfully Use and Share Voter Information ................. 4

LEGAL STANDARD..................................................................................................... 8

ARGUMENT ................................................................................................................. 8

    I.   The United States' Demands Exceed the Statutory Authority of the CRA and
        Are Contrary to Law. ................................................................................... 8

        A.  The United States' Demand Fails to Meet the CRA's Requirement for
            a Statement of the Basis and the Purpose. ........................................... 9

        B.  Any Records Disclosed Under the CRA Should Be Redacted to Protect
            the Constitutional Rights of the Voter, so the Requested Relief Must
            Fail. ................................................................................................ 14

    II.  The United States Is Not Entitled to Summary Disposition and Its Motion to
        Compel Should Be Denied............................................................................ 16

CONCLUSION............................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ................................................................. 1

*American Federation of State, County, & Municipal Employees, AFL-CIO v. Social Security Administration*,
  No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026).......................................... 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................... 8

*Becker v. United States*,
  451 U.S. 1306 (1981)................................................................................ 19

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................................................ 14

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
  603 U.S. 799 (2024)................................................................................ 12

*Crook v. South Carolina Election Commission*,
  No. 2025-CP-40-06539 (S.C. Ct. C.P. Oct. 1, 2025).............................. 16

*Eakin v. Adams County Board of Elections*,
  149 F.4th 291 (3d Cir. 2025) ................................................................. 1

*Federal Deposit Insurance Co. v. Wentz*,
  55 F.3d 905 (3d Cir. 1995)..................................................................... 11

*Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013).................................................................... 8

*Heritage Valley Health System, Inc. v. Nuance Communications, Inc.*,
  479 F. Supp. 3d 175 (W.D. Pa. 2020)....................................................... 8

*Illinois State Board of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979)................................................................................. 1

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962),
  *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ...................................... 10

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ................................................................. passim

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......................................................................................... 12

*PA Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) ................................................................. 6

*Pennsylvania State Conference of NAACP Branches v. Secretary of Commonwealth of Pennsylvania*,
97 F.4th 120 (3d Cir. 2024) ................................................................................ 9

*Peters v. United States*,
853 F.2d 692 (9th Cir. 1988) ............................................................................ 11

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ..................................................................... 15, 16

*Public Interest Legal Found., Inc. v. Dahlstrom*,
673 F. Supp. 3d 1004 (D. Alaska 2023) ............................................................ 15

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) .......................................................................... 12

*Public Interest Legal Foundation v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Pa. 2019) ............................................................... 15

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........................................................................ 15, 16

*Public Interest Legal Foundation, Inc. v. Matthews*,
589 F. Supp. 3d 932 (C.D. Ill. 2022) ............................................................... 15

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ........................................................................... 15

*Sheetz v. County of El Dorado*,
601 U.S. 267 (2024) ......................................................................................... 16

*United States v. Oregon*,
6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) .................... 8, 13, 19

*United States v. Powell*,
379 U.S. 48 (1964) ..................................................................................... 10, 19

*United States v. Weber*,
2:25-CV-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ....... passim

*West v. Bowen*,
879 F.2d 1122 (3d Cir. 1989) ........................................................................... 14

iii

**Statutes**

26 U.S.C. § 7604(a) .................................................................................................. 19

5 U.S.C. § 552a ......................................................................................................... 13

52 U.S.C. § 20507 ............................................................................................... passim

52 U.S.C. § 20701 ....................................................................................................... 9

52 U.S.C. § 20703 ..................................................................................................... 10

52 U.S.C. § 20705 ..................................................................................................... 19

52 U.S.C. § 21083 ..................................................................................................... 12

52 U.S.C. § 21085 ................................................................................................. 12, 13

18 U.S.C. § 2721 ....................................................................................................... 20

Pub. L. No. 107-347, 116 Stat. 2899 (2002) ............................................................ 20

44 U.S.C. §§ 3351 ..................................................................................................... 20

Pub. L. No. 93-579, 88 Stat. 1896 (1974) ................................................................ 20

**Other Authorities**

*Federal Judicial Circuits: Fifth Circuit*, FEDERAL JUDICIAL CENTER (last visited Dec. 9,
    2025) ................................................................................................................ 17

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated
    on 2020 Grievances*,
    N.Y. TIMES, Oct. 22, 2025 .................................................................................. 6

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians
    Trying to Sway the Election and Change the Country*,
    PROPUBLICA, July 13, 2024 ................................................................................. 6

Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to
    Overturn Election*,
    LANCASTERONLINE, July 21, 2024 ....................................................................... 6

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National
    Voter Roll*,
    N.Y. TIMES, Sept. 9, 2025 ............................................................................. 5, 18

iv

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025 ........................................................................................... 6

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025................................................................................ 5

H.R. Rep. No. 86-956 (1959)................................................................................................. 1

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAP.-STAR, Aug. 27, 2025.................................................................................................. 6

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025 ..................................................................................................... 5

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025 ........................................................................................................... 6

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025 ............................................................................................................ 7

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Center for Justice (updated Feb. 6, 2026) .................................................... 2

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026 ...................................................................................................... 7

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025 ...................................................................................... 6

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025 ............................................................................................................ 6

Press Release, U.S. Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026)................................................ 4

Press Release, U.S. Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025) ............................................................................................................................... 4

Press Release, U.S. Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025)........................................................................ 4

Press Release, U.S. Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025) ............................................. 4

Press Release, U.S. Department of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025) ................................................. 4

Press Release, U.S. Department of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025) ................................................. 4

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025 .................................................. 5

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976) ....................... 18

*This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT, Feb. 12, 2024........................................................................... 6

U.S. Department of Justice, Civil Right Division, Federal Law Constraints on Post-Election "Audits" (Jul. 28, 2021).................................................................................... 1

**Rules**

Fed. R. Civ. P. 1 .................................................................................................. 16

Fed. R. Civ. P. 12.............................................................................................. 8, 14

Fed. R. Civ. P. 56............................................................................................... 14

Fed. R. Civ. P. 81............................................................................................... 17

**INTRODUCTION**

The United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and its attempt to summarily dispose of this case via an improper motion to compel should be rejected.

The right to vote "is of the most fundamental significance under our constitutional structure." *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 304–05 (3d Cir. 2025) (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). And Congress has repeatedly legislated to ensure that all eligible Americans can participate in free, fair, and secure elections. As the U.S. Department of Justice has explained, Title III of the Civil Rights Act of 1960 ("Title III" or "CRA"), the provision invoked here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., C.R. Div., Federal Law Constraints on Post-Election "Audits" (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956, at 7 (1959)).

The United States' demand for Delaware's unredacted voter file—which contains sensitive personal information including driver's license numbers and Social Security numbers from hundreds of thousands of Delawareans—undermines the CRA's core purpose and is contrary to law. Releasing voter records without redaction and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here, where the United States has not fully and accurately set forth "the basis and the purpose" for its request, as required by the statute that it invokes. 52 U.S.C. § 20703. The Court should dismiss.

**BACKGROUND**

I.    **DOJ's Efforts to Obtain Private Voter Information**

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"),

1

began sending letters to election officials in at least forty states, making escalating demands to produce voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Feb. 6, 2026), https://perma.cc/92T3-4THV.

On July 11, 2025, DOJ sent a letter to Delaware State Election Commissioner Anthony Albence, asking questions regarding Delaware's voter list maintenance procedures and requesting that Delaware provide information about purported "registered voters identified as ineligible to vote," for example, due to non-citizenship. Pl.'s Mot. to Compel, Ex. 1, Ltr. from Michael Gates to Anthony Albence dated July 11, 2025, D.I. No. 4-1 ("July 11 Letter"); Compl. ¶¶ 18–19. The letter also requested an electronic copy of Delaware's entire statewide voter registration list with "all fields," and asked Delaware to provide this information within 14 days. July 11 Letter; Compl. ¶ 19. The July 11 Letter referenced the NVRA and HAVA but did not mention the CRA. *See id.* On July 25, 2025, Commissioner Albence replied, noting that "[w]e anticipate fully responding to the requests and issues raised in your July Letter," and explaining that their office would "provide a copy of Delaware's voter registration list, pursuant to [state law] and consistent with the state's obligations under the NVRA," but would not provide the fields that are "protected from disclosure under Delaware law." Pl.'s Mot. to Compel, Ex. 2, Ltr. from Anthony Albence to Maureen Riordan and Michael Gates from July 25, 2025, D.I. No. 4-2 ("July 25 Letter"); Compl. ¶ 21.

On August 4, 2025, DOJ sent a letter asking for responses by August 15, 2025. Pl.'s Mot. to Compel, Ex. 3, Ltr. from Maureen Riordan and Michael Gates to Anthony Albence dated August 4, 2025, D.I. No. 4-3 ("August 4 Letter"); Compl. ¶ 22.  On August 6, 2025, the Delaware Deputy Attorney General sent an email to DOJ, noting that she was "in the process of reviewing" DOJ's request, and asking for more information about the application of the federal Privacy Act of 1974

2

to Delaware's statewide voter file, including how DOJ would "store and maintain the information," and the "citation within the Federal Register to the system of records under which DOJ intends to collect and maintain the records." Email from Emily Burton to Maureen Riordan and DOJ Voting Section dated August 6, 2025, https://perma.cc/99L5-DRQN ("August 6 Email").

On August 14, 2025, DOJ followed up with a letter stating that the electronic copy of the statewide voter registration list "must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Pl.'s Mot. to Compel, Ex. 4, Letter from Harmeet Dhillon to Anthony Albence dated August 14, 2025, D.I. No. 4-4 ("August 14 Letter"); Compl. ¶ 23. This time, DOJ also cited the CRA as authority for its request and noted that the "purpose of the request is to ascertain Delaware's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies with respect to those statutes' requirements, and did not address the specific questions about the Privacy Act of 1974 raised in the August 6 Email. *See* August 14 Letter.

On August 15, 2025, Commissioner Albence sent a letter with detailed responses to questions from DOJ's July 11 Letter, explaining how Delaware's list maintenance program complies with federal law. Pl.'s Mot. to Compel, Ex. 5, Ltr. from Anthony Albence to Maureen Riordan and Michael Gates from August 15, 2025, D.I. No. 4-5 ("August 15 Letter"); Compl. ¶ 26. Commissioner Albence also described concerns regarding DOJ's request under the Privacy Act, and asked for "any authority" for disclosing "non-public, sensitive, personally identifying information (such as social security numbers)." August 15 Letter. Commissioner Albence sent another letter on August 21, 2025, reiterating these points and addressing DOJ's "new demand" under the CRA, which implicated "serious and important requirements" from a legal and practical

3

perspective. Ltr. from Anthony Albence to Maureen Riordan and Michael Gates dated August 21, 2025, https://perma.cc/Y7RY-73V8 ("August 21 Letter"). Finally, on September 16, 2025, Commissioner Albence sent a letter explaining why the "August 14 letter does not pose a valid request for information under the CRA," and again citing the Privacy Act and Delaware state law prohibiting disclosure of the requested information. Pl.'s Mot. to Compel, Ex. 6, Ltr. from Anthony Albence to Maureen Riordan and Michael Gates dated September 16, 2025, D.I. No. 4-6 ("September 16 Letter"); Compl. ¶ 27.

The United States responded by filing this lawsuit, which is one of at least twenty-five similar suits seeking disclosure of sensitive voter data.[1] The same day, the United States also filed a motion to compel the production of these records. Mot. to Compel, D.I. No. 3.

## II.     The United States' Plans to Unlawfully Use and Share Voter Information

According to extensive public reporting, DOJ's requests for sensitive voter data from Delaware and other states do not appear to relate to voter list maintenance under the NVRA or HAVA, the statutes invoked in the August 14 Letter. Rather, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept.

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One article extensively quoted a lawyer who recently left DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

These efforts are reportedly being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections.[2] These actors and their associates have previously

---

[2] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAP.-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-

sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 599 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by group affiliated with "election integrity" advocate and current DHS official Heather Honey, challenging Pennsylvania's list maintenance practices pursuant to HAVA).[3] According to public reporting, DOJ also recently asked staffers from the "Department of Government Efficiency" ("DOGE") to identify non-citizens in state voter rolls by matching voter data with data from the Social Security Administration ("SSA").[4] DOJ officials have since claimed to have "checked 47.5 million voting records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," though public reporting indicates these efforts are producing false positives— *i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[5] A recent

---

election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6; Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://perma.cc/E87D-XDRX; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q.

[3] *See, e.g.*, Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT (Feb. 12, 2024), https://perma.cc/HQ9C-TMT7 (discussing Honey's "false" claims regarding voting in Pennsylvania in 2020 and her extensive collaboration with Mitchell); *see also* Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LANCASTERONLINE (July 21, 2024), https://perma.cc/K92T-L288 (describing Mitchell meeting with PA Fair Elections).

[4] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[5] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

federal court filing by DOJ on behalf of the SSA corroborates how United States officials have sought to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques and have been working with outside "election integrity" advocates seeking to deny election results in those efforts:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, D.I. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities taken pursuant to it, also indicated that around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

Recent events have further highlighted the extremely abnormal nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[6] The letter sets out actions

---

[6] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, (Jan. 24, 2026), https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), D.I.. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

that Minnesota—another state DOJ has sued to obtain sensitive voter data—should take to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota," one of which is to allow DOJ "to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[7] As another court noted in addressing a similar request for voter roll data in Oregon, "[t]he context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court need not accept a complaint's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor can "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," survive a motion to dismiss. *Id.* at 678–79. In ruling on a motion to dismiss, courts may also consider, for example, "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013); *see also, e.g.*, *Heritage Valley Health Sys., Inc. v. Nuance Commc'ns, Inc.*, 479 F. Supp. 3d 175, 181 (W.D. Pa. 2020) (granting motion to dismiss and judicially noticing an official government communication).

## ARGUMENT

I.   **The United States' Demands Exceed the Statutory Authority of the CRA and Are Contrary to Law.**

The United States' demand for Delaware's full, unredacted voter file exceeds its statutory

---

[7] Bondi Letter at 2, 3.

authority under the CRA. Against the backdrop of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"); *see also Pa. State Conf. of NAACP Branches v. Sec'y of Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024) (explaining that Congress enacted the CRA to rein in "efforts to deny the right to vote," including "arbitrary registration procedures" to qualify to vote (citation omitted)). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for Delaware's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, any records disclosed under the CRA should be redacted to vindicate the privacy and constitutional rights of Delaware voters. Nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters.

### A. The United States' Demand Fails to Meet the CRA's Requirement for a Statement of the Basis and the Purpose.

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under

9

Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand shall contain a statement of *the basis and the purpose therefor*." *Id*. (emphasis added).

Contemporaneous case law following Title III's enactment shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). "Basis" and "purpose" under Title III have consistently been treated as distinct concepts. *See id*.; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom*., *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

The CRA's requirement for a statement of the basis and purpose is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *United States v. Weber*, 2:25-CV-9149-DOC-ADS, 2026 WL 118807, at *9 (C.D. Cal. Jan. 15, 2026). It prevents the CRA from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *Id.* The statutory basis and purpose requirements are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. In the context of administrative subpoenas, in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *United States v. Powell*, 379 U.S. 48, 57 (1964), and that such subpoenas "may not be so broad so as to be in the nature of a 'fishing expedition.'" *Peters v. United States*,

10

853 F.2d 692, 700 (9th Cir. 1988). Such purpose requirements ensure that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation via administrative subpoena).

DOJ's requests fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted Delaware voter file. *First*, the United States has not stated a proper "basis" for its demand. The July 11 Letter does not mention the CRA at all. *See* July 11 Letter. And the August 14 Letter—which is the first to mention the CRA—likewise includes only a bare assertion that the purpose is to "ascertain Delaware's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter. Not even a nominal basis is provided. *See id.* Neither the Complaint nor the letters allege adequate evidence of anomalies or anything amiss with Delaware's list maintenance. *See supra* pp. 2–4; *see also Weber*, 2026 WL 118807, at *9–10 (finding that the United States did not meet the statutory "basis" requirement as it failed to provide any reason why the state violated federal law in comparable action against California).

*Second*, even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the request for the full unredacted voter file. It does not explain why unredacted voter files are necessary to determine whether Delaware has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4); Compl. ¶ 12. In fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the State's discretion. *See* 52 U.S.C. § 20507(a)(4), (c)(1); *id.* §§

11

21083(a)(2)(A), § 21085. The procedures carried out by a state establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Delaware's voter list at a single point in time, that would not amount to Delaware failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this voter list maintenance context). As a court noted in a similar lawsuit by DOJ seeking California's unredacted voter file, "the DOJ's proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived." *Weber*, 2026 WL 118807, at *8 (dismissing DOJ's complaint for failure to state a claim without leave to amend).

*Third*, even if the United States had plausibly set forth some facially sufficient statement of the basis and the purpose for its request related to compliance with the NVRA and HAVA, the CRA claim would be subject to dismissal because DOJ's stated reason for requesting the sensitive personal data appears incomplete, if not completely pretextual. Section 303 requires a statement of "the basis and the purpose" of a records request, and by twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the actual* basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and indefinite article). The United States' failure to fully and accurately provide this information is fatal to its suit, where public reporting and public, judicially noticeable documents show that it did not disclose the main basis and purpose for its demand: building a national voter file for its own use, to be shared with other agencies and unaccountable advocacy groups for unlawful purposes. *See supra* pp. 4–8 & nn. 2–7; *see also*

12

*Weber*, 2026 WL 118807, at *10–11 (holding that courts hearing requests under Title III are "not obliged to accept a contrived statement and purpose"); *United States v. Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."). As Congress has never authorized the creation of such a database, its creation would violate the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote); *Weber*, 2026 WL 118807, at *17–19 (detailing the way in which the federal government's data demands "violate the Privacy Act").

Moreover, far from ensuring compliance with the NVRA and HAVA, the memorandum of understanding that DOJ has proposed to states, *see* Ex. A, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"), actually *runs afoul* of those statutes. The MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text, *id.* § 21085 (methods of complying with HAVA "left to the discretion of the State"), and its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," in a way that would violate multiple protections of the NVRA, including requirements that certain voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *see* 52 U.S.C. § 20507(d)(1)(B). MOU, at 2, 5. This now-public MOU shows that the United States' supposed purpose is not in compliance with federal law but in aggrandizing authority to a federal agency in ways contrary to federal law.

Under the circumstances here, the United States' invocation of Title III of the CRA fails in myriad ways to provide a sufficient "statement of the basis and the purpose" for its demand and

13

does not comply with the CRA. Dismissal is proper.[8]

### B. Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter, so the Requested Relief Must Fail.

Even if disclosure were appropriate, sensitive personal voter information would still be subject to redaction, which is not barred under Title III. Courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. The cases interpreting Section 8(i) of the NVRA are instructive, as courts have consistently permitted—and sometimes required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law and the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703, 20507(i)(1). Courts must interpret the disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See West v. Bowen*, 879 F.2d 1122, 1132 (3d Cir. 1989) (noting the canon of constitutional avoidance, "a long-standing canon of construction that a statute should be read, whenever possible, to avoid constitutional entanglements" (citing *Califano v. Yamasaki*, 442 U.S. 682, 693 (1979)). Federal courts have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i)[9] to permit—and sometimes require—redaction and the protection of confidential

---

[8] Dismissal on the grounds set forth above would also be proper under Federal Rule of Civil Procedure 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Federal Rule of Civil Procedure 56.

[9] Specifically, Section 8(i) of the NVRA requires that: "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with exceptions "to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a non-citizen and subjecting them to public harassment warrants maintaining confidentiality). Other courts have consistently reached the same conclusion. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." *Id.* The court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id*. at 334, 339; *cf. In re Coleman*, 208 F. Supp. at 200 (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason

15

of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. *See Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Delaware voters, especially naturalized citizens and survivors of domestic violence, is present here. *See* Mot. to Intervene, Ex. A, Decl. of Maria Matos ("Matos Decl.") ¶¶ 4–12, D.I. No. 24-1; Ex. B, Decl. of Bryant Garcia ("Garcia Decl.") ¶¶ 4–10, D.I. No. 24-2; Ex. C, Decl. of Sue Ryan ("Ryan Decl.") ¶¶ 4–11; D.I. No. 24-3; Ex. D, Decl. of Jose Matthews ("Matthews Decl.") ¶ 7; D.I. No. 24-4.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And the limited case law considering CRA records requests acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.[10]

## II.    The United States Is Not Entitled to Summary Disposition and Its Motion to Compel Should Be Denied.

The Federal Rules of Civil Procedure, with limited exception, "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include the claim under Title III here. *See* Fed. R. Civ. P. 81. Ignoring these standards, the United

---

[10] The United States cites *Crook v. S.C. Election Comm.*, No. 2025-CP-40-06539 (S.C. Ct. C.P. Oct. 1, 2025), a non-binding decision which briefly discussed Title III in dicta. Mot. to Compel Br. at 14. *Crook* did not address Intervenors' arguments about the basis-and-purpose requirement or the need to redact sensitive voter information, so carries little persuasive weight.

States makes expansive claims that Title III universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute [was made], explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. in Supp. of Request for Order to Compel Prod. of Recs., D.I. No. 4 ("Mot. to Compel Br.") at 6–7 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225–26 (5th Cir. 1962)). This is contrary to the Federal Rules, not contemplated by statute, and rests on misreading a single set of non-binding cases decided more than sixty years ago, in a different circuit and a drastically different context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel Br.; *see also* Compl. ¶¶ 1–4. As the court recently noted in rejecting an analogous attempt in California, "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel Br. at 5 n.1. But the United States studiously ignores why that is the case. *Lynd* arose in a specific historical context: the Jim Crow-era Fifth Circuit—which then included Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[11] In these states, election officials and others, including judges, notoriously used every possible means to block Black Americans from registering to vote.[12] It was against this

---

[11] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[12] *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

17

backdrop that the Fifth Circuit noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and the purpose of the Attorney General's request was self-evident, and plenary consideration thus not required. *See id.* That court's treatment of the CRA more than sixty years ago cannot be divorced from its context.[13]

By contrast, here, more than half a century later, the context of *this* request could not be more different. The United States is not seeking to respond to a crisis of racially motivated disenfranchisement, but rather has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive personal information—amid both the United States' own MOU and extensive reporting suggesting that the stated basis and purpose are pretextual, and that the data at issue is in fact being sought for unlawful ends.[14]

Nothing in Title III insulates the sufficiency of the requirement for a "statement of the basis and the purpose" from standard judicial review. *See* 52 U.S.C. § 20703. Since *Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United*

---

[13] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging that while "[t]he right of free examination of official records is the rule" under Title III there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

[14] *See, e.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES (Sept. 9, 2025), https://perma.cc/Z3RD-GNX9; Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG. (Nov. 16, 2025), https://perma.cc/R3ZA-USSW.

*States*, 451 U.S. 1306, 1307–08 (1981) (citation and quotation marks omitted); *see also Powell*, 379 U.S. at 57–58 (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *United States v. Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*"). Just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)).

Even in *Lynd*, the court, in explaining its findings, noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. The court also noted that the CRA authorizes jurisdiction by "appropriate process" to compel production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960s, before sensitive personal information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and

19

before any federal laws had been passed to protect and constrain access to personal information,[15] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated that the "duty to issue protective orders" would arise for certain CRA records requests, *id.* at 230.

The unredacted voter file contains "confidential, private" personal identifying information of Delaware voters that would *not* ordinarily be open to reasonable inspection. *Id.* at 231. To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required stated basis and purpose, would go even further than *Lynd* did—in a context where, very much unlike there, the basis and purpose are not inarguably clear but instead appear pretextual. As the court has recognized in the analogous lawsuit in California, the United States' motion to compel seeks "to reach the ultimate question in this case regarding the production of records," and "thousands of voters' lives will be impacted by this case." Hr'g Tr. at 5:3–9, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 4, 2025), D.I. No. 100. This Court should reject the United States' efforts to bypass core procedural protections. *See Weber*, 2026 WL 118807, at *8 ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures.").

## CONCLUSION

For all these reasons, the United States' Motion to Compel should be denied and the Complaint dismissed.

---

[15] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

Dated: February 9, 2026

Respectfully submitted,

Theresa J. Lee*
Jonathan Topaz*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
jtopaz@aclu.org
slakin@aclu.org

Patricia J. Yan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20001
(202) 457-0800
pyan@aclu.org

/s/ Andrew Bernstein
Andrew Bernstein (#7161)
100 W. 10th St. #706
Wilmington, DE 19801
Phone: (302) 551-6809 Ext. 119
Email: abernstein@aclu-de.org

*Attorneys for Intervenors Latin American
Community Center, La Esperanza, Delaware
Coalition Against Domestic Violence, and Jose
Matthews*

*Admitted pro hac vice*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served via the

Court's ECF system on all counsel of record on February 9, 2026, and will be served on Defendant

in accordance with Federal Rule of Civil Procedure 5(a).

<u>/s/ Andrew Bernstein</u>
Andrew Bernstein
