IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> Plaintiff, <br><br> v. <br><br> ANTHONY ALBENCE, in his Official Capacity as State Election Commissioner of Delaware, <br><br> Defendant. | Case Number: 1:25-cv-01453-RGA |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (D.I. 33) AND IN REPLY TO INTERVENORS' MOTIONS TO DISMISS (D.I. 36, 39)**

*Counsel for the United States*

_____/s/ Eric Neff_____
ERIC NEFF
Acting Chief, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.1807
Washington, D.C. 20002
Eric.Neff@usdoj.gov
Tel. (202) 307-2767

Date: February 23, 2026

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   BACKGROUND ................................................................................................... 3

III.  MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND
      CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND ............... 5

      A.   Title III of the CRA does not require allegations that the federal elections records
           demanded are needed to investigate race-based denial of voting rights. ..................... 6

      B.   Delaware's SVRL falls within Section 301's broad definition of "all records and
           papers" relating to registration to vote in federal elections. ....................................... 10

      C.   The United States is entitled to unredacted "reproduction" and "copying" of
           Delaware's federal election records, including its SVRL. .......................................... 16

IV.   THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS ............ 19

      A.   The United States is complying with the Privacy Act. ................................................ 19

      B.   The First Amendment does not prohibit access to data the United States needs for its
           HAVA and NVRA claims. ............................................................................................. 21

      C.   The E-Government Act does not prevent the United States from obtaining data
           supporting its HAVA and NVRA claims. ..................................................................... 22

      D.   The Driver's Privacy Protection Act does not allow Defendant to deny the United
           States list maintenance data. ........................................................................................ 24

V.    CONCLUSION ................................................................................................... 255

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .................................................. 3

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ..................................................... 9

*Coal. for Open Democracy v. Scanlan*,

   No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025).......................................... 18

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962)........................................... 7

*Ebert v. Poston*, 266 U.S. 548 (1925) ......................................................... 9

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*,

   266 F. Supp. 3d 297 (D.D.C. 2017) ........................................... 23

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*,

   878 F.3d 371 (D.C. Cir. 2017) ................................................... 23

*Ex Parte Siebold*, 100 U.S. 371 (1879)........................................... 3

*Foster v. Love*, 522 U.S. 67 (1997)............................................... 3

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).................................. passim

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)............................ 3

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006)..................... 15

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952)............................. 9

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ........................... 9

*United States v. N. Carolina Bd. of Elections*, 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025) ............. 8

*United States v. Weber,* Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan 15, 2026) ............. 9

**Statutes**

18 U.S.C. § 2721 ...................................................................... 24

18 U.S.C. § 2725 ...................................................................... 24

52 U.S.C. § 20507 ................................................................ 4, 17

52 U.S.C. § 20510 ...................................................................... 4

52 U.S.C. § 20701 ................................................................................................ passim

52 U.S.C. § 20703 ................................................................................................ passim

52 U.S.C. § 20705 .................................................................................................... 1, 4

52 U.S.C. § 21083 ................................................................................................ 3, 5, 17

52 U.S.C. § 21111 ........................................................................................................... 4

The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ................................. 22, 23

**Other Authorities**

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral

    Process (Aug. 2021) ................................................................................................... 8

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ............................................................................................. 3

**Legislative Materials**

106 Cong. Rec. 7767 ...................................................................................................... 7

H.R. Rep. 107-329, pt. 1 (2001) ..................................................................................... 8

Plaintiff United States of America respectfully submits this Memorandum of Law in opposition to the Motions to Dismiss by: (1) Defendant State Election Commissioner Anthony Albence ("Defendant") (D.I. 33); (2) Intervenor-Defendants Bethany Jennings and Gemma Lowery ("Jennings") (D.I. 36); and (3) Intervenor-Defendants Latin American Community Center, La Esperanza, Delaware Coalition Against Domestic Violence, and Jose Matthews ("LACC") (D.I. 39). Collectively, Defendant and Intervenor-Defendants are referred to as the "Defendants." The United States submits both this brief and the United States' Reply to Defendants' Oppositions to United States' Motion to Compel ("Reply Brief") to address duplicative and overlapping arguments collectively in compliance with the Court's Order in D.I. 52.

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Delaware's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States sent correspondence to Defendant, requesting his cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Those efforts were met by Defendant's refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Delaware's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the

1

production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Defendants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (D.I. 3) should be granted, Defendants' Motions to Dismiss (D.I. 33, 36,37) should be denied, and an order compelling production of Delaware's SVRL and other responsive federal election records should be entered.

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 10-15 and U.S. Reply Brief, D.I. 56, at 4-6.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States. *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that

3

makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, on August 14, 2025, the Department of Justice sent Defendant a letter requesting a copy of Delaware's SVRL ("August 14 Letter"). *See* Ex. 4 to Decl. of Maureen S. Riordan ("Riordan Decl."), D.I. 4-4. As stated in the letter, the basis for the demand was Title III of the CRA*,* and the purpose was to "ascertain Delaware's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* The letter informed Defendant that the list is subject to federal privacy protections, and that the statewide voter registration list could be produced via secure channels. *Id.* The United States erroneously included in its Complaint that the letter cited its System of Records Notice ("SORN") to Defendant, and hereby moves to amend ¶25 of its Complaint as such.[2]

Defendant responded on September 16, 2025, citing state and federal privacy concerns, that he would not provide a copy of the SVRL including all fields. *See* Ex. 6 to Riordan Decl., D.I.

---

[2] The United States regrets the error and appreciates Defendant's counsels' communications to rectify. For more discussion of the applicable SORN, see Sect. IV-A, *infra.*

4-6. On December 2, 2025, the Attorney General then instituted these summary proceedings to compel production. *See* Compl., D.I. 1, 3-4.

As explained in the attached declaration of Eric Neff, the United States seeks these documents for one purpose only: to evaluate Delaware's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. *See* Decl. of Eric Neff ("Neff Decl.") ¶ 5. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. Neff Decl. ¶3.

## III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. Def.'s Opp'n, D.I. 35 at 12-13; LACC Mem. Supp. Mot. Dismiss, D.I. 41 at 16-17. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. Def.'s Mot. Dismiss, D.I. 34 at 5; Def.'s Opp'n, D.I. 35 at 3; LAAC Mem. Supp. Mot. Dismiss, D.I. 41 at 9. They ask the Court to ignore the congressional mandate and caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Def.'s Mot. Dismiss, D.I. 34 at 12-14; Def.'s Opp'n, D.I. 35 at 17; LAAC Mem. Supp. Mot. Dismiss, D.I. 41 at 9-14; Jennings Mem. Supp. Mot. Dismiss, D.I. 37 at 7-13. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to

encompass only publicly available records. For the reasons discussed below and in the United States' Reply Brief, these arguments are without merit.

**A.     Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

The CRA's plain language notably excludes mention of racial discrimination. Congress made clear in the CRA where it intended to impose such a limit. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights

violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* cited by Defendants, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Ala. ex rel. Gallion v. Rogers, 187 F. Supp. 848 (M.D. Ala. 1960)* (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman v. Kennedy, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("Coleman II")* (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Intervenor LAAC suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is used to "disenfranchise voters." LAAC Mem. Supp. Mot. Dismiss, D.I. 41 at 6. They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain

> the last 4 digits of this number as an added identifier [SSN4s]. The Federal
> Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) (excerpts provided as Neff Decl., Ex. 16). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[3] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights.

---

[3] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 11-13. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as Neff Decl., Ex. 11). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Neff Decl., Ex. 12).

Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. *United States v. Benson,* Case No. 1:25-cv-01148-HYJ-PJG, slip op. at 14. (W.D. Mich. Feb. 10, 2026) (attached to Neff Decl. as Ex. 13*)*. The court first rejected the argument made in *United States v. Weber,* Case No. 2:25-cv-09149-DOC-ADS, slip op. 15 (C.D. Cal. Jan 15, 2026) that the CRA applies to only those statutes in effect when the CRA became law. *See Weber* decision attached to Neff Decl. as Ex.

9

14. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, slip op. at 17, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

**B.      Delaware's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic or non-public records, as Defendant argues. Def.'s Mot. Dismiss, D.I. 34 at 16-17. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Defendants suggest.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a reason not raised by Defendants: that it applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." Slip op. at 18-19 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[4] Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that

---

[4] According to the data that Vermont reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 163, 165 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 17, 2026).

"the distinction between voter registration applications and voter registration lists is overly pedantic…" Slip op. at 22. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, slip op. at 22. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 230701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the

possession of," which would include documents or records that were self-generated. Slip op. 19 (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession. And Defendant acquired the relevant records in the course of carrying out his duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Commissioner"; "30 days after such information comes into the possession of the Commissioner"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering

one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.[5]

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," slip op. 19, are temporal distinctions—not distinctions between obtaining records from an outside source and through self-generation—as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization is declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Commissioner of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of

---

[5] Defendant argues that this retention requirement only requires production of voter rolls for federal elections that occurred in the last 22 months. Def.'s Mot. Dismiss, D.I. 34 at 16. But the 22-month qualification describes the time required for preservation, not the specific election to which any records request applies.

election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. And Commissioner of State Albence, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, this construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[6] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* Neff Decl. ¶ 4. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

---

[6] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), D.I. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at D.I. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 17, 2026). For the Court's convenience, the three documents are provided herein as Neff Decl., Exs. 8-10.

**C.      The United States is entitled to unredacted "reproduction" and "copying" of Delaware's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Defendants ask the Court to legislate limitations conspicuously absent from Title III. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall

16

include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Delaware's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Defendants that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[7] *Lynd*, 306 F.2d at 230.

Finally, if the Defendants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[8] *See supra* Part

---

[7] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 15. As of February 23, 2026, twelve states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU. *Id.* Three other states have indicated their intention to provide the SVRLs in the near future. *Id.*

[8] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration

III(B). There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same that twenty-five states (including Delaware) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[9] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *1 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Delaware's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting "order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

---

records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[9] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 23, 2026).

## IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS

Defendants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of Delaware's federal election records. Those arguments are misguided at best. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment under E-Government Act does not apply to the investigation of Delaware's list maintenance practices being conducted by the United States under HAVA and the NVRA. Likewise, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

### A.    The United States is complying with the Privacy Act.

Defendant argues that the United States must comply with the Privacy Act, and the United States is doing that. But Defendant goes even further, contending that dismissal is appropriate "because DOJ's demand for an unredacted copy of Delaware's VRL runs afoul of the Privacy Act." Def.'s Mot. Dismiss, D.I. 34 at 17. Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information,

which include investigations and enforcement actions, can be found in the Department of Justice's SORN, most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151.

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. *See* Exs. D.I. 4-1, 4-4. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Defendants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not for the purpose of "building a national voter file for its own use[.]" LAAC Mot. Dismiss, D.I. 41 at 12; *see also* Def.'s Opp'n, D.I. 35 at 10 (citing a *New York Times* article with only a non-sourced allegation that the United States is "essentially establish[ing] a national voting database"); Jennings' Mot. Dismiss, D.I. 37 at 4 (citing same *NYT* article). Rather, the records sought from Delaware are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA.[10] Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

---

[10] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. Neff Decl. ¶ 6.

Similarly, to the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of Delaware's SVRL to the United States, as Defendant contends. Def.'s Mot. Dismiss, D.I. 34 at 17-18. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Defendant to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

**B.     The First Amendment does not prohibit access to data the United States needs for its HAVA and NVRA claims.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting Delaware's SVRL. Defendant contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment and implicates a statutory bar to collecting such data. Def.'s Mot. Dismiss, D.I. 37 at 18-19; *see also* LAAC Mot. Dismiss, D.I. 41 at 13 (citing *Weber*). But Defendant misses the mark. Without question, voting and registration

implicate speech and actions protected under the First Amendment. But that does not foreclose the United States from enforcing federal election laws like HAVA and the NVRA. The application of Defendant's argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

**C.     The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.**

Defendant next argues that the demand for production of Delaware's SVRL and other federal election records violates the E-Government Act. Def.'s Mot. Dismiss, D.I. 34 at 19. Again, neither the E-Government Act nor interpretative case law support his assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Defendant to provide a voter registration list already maintained pursuant to federal law to analyze Delaware's federally required list maintenance. The SVRL would be kept on a system for which a Privacy

Impact Assessment (PIA) has been done.[11] Only when a new system is established—not when each new data request is made—is a PIA required.[12]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of PIAs would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

Even if the Court found the E-Government Act applied here—and it should not—Defendant has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* Def.'s Mot. Dismiss, D.I. 34 at 19. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In that case, the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, the *EPIC II* court explained that the Act "is intended to protect

---

[11] An Initial Privacy Assessment Determination was issued on October 12, 2012, showing that no PIA is required for the Justice Consolidated Office Network system where personal identifying information associated with the United States' CRA demand is stored. *See* Neff Decl. ¶ 7.

[12] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Feb. 17, 2026).

*individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id*. at 378 (emphasis in original).

> **D.      The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.**

Finally, Defendant incorrectly maintains that dismissal is warranted because the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). Def.'s Mot. Dismiss, D.I. 34 at 20. The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V.    CONCLUSION

For the foregoing reasons, as well as those in its Reply Brief, the United States respectfully submits that the Motions to Dismiss and Oppositions to Motion to Compel by Defendant (D.I. 33, 35), Jennings (D.I. 36, 38), and LACC (D.I. 39) be denied and the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (D.I. 3) be granted.

DATED:    February 23, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General

_____

ERIC V. NEFF
Acting Chief, Voting Section
MEGAN FREDERICK
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Eric.Neff@usdoj.gov
Tel. (202) 307-2767

Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, a true and correct copy of the foregoing document was served via the email to all counsel of record.

_____

MEGAN FREDERICK
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Megan.Frederick@usdoj.gov
Tel. (202) 704-5430
Attorney for the United States

26